UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JANE DOE,

        Plaintiff,

    v.                                   CAUSE NO. 3:25cv133 DRL-SJF

JONATHAN REES,

        Defendant.

## OPINION AND ORDER

Last year, Jane Doe sued Jonathan Rees (also known as Greg Ellis). She had previously sued him in the United States District Court for the Northern District of New York. There she alleged that, after an on-again and off-again relationship for over six years, she ended it only to have him commence a campaign of harassment, defamation, and hostility—including threatening to disclose a depiction of an intimate moment—with that campaign involving her, her daughter, and her business associate, and later federal agencies, police departments, and the courts. He reportedly maintained a large social media following too.

Mr. Rees defaulted in the New York action. Ms. Doe alleges that he sold his New York home and fraudulently transferred the proceeds to this district. Under Indiana's Uniform Fraudulent Transfer Act (IUFTA), she sought a money judgment in the amount of the transfer (among other relief). He failed to appear or answer the complaint timely, so she secured a near $1 million default judgment that today he seeks to vacate for lack of service. For her part, after attempting many other methods to serve Mr. Rees at other locations, Ms. Doe says her investigator perfected service of process (per a signed return) by leaving the complaint and summons at his home on Florimond Avenue in Michigan City, Indiana on February 21, 2025.

The court entered a prejudgment order of attachment the next month, then made an entry of default and awarded a default judgment on April 17, 2025. Mr. Rees claims that he learned of the suit only four days later, on April 21. Not until July 9 did he appear and move to vacate the default judgment, arguing he was never properly served and the court lacked personal jurisdiction. After briefing, and some minimal discovery requested of his golf club in Long Beach, Indiana, the court held an evidentiary hearing on October 3 and heard argument on October 29, 2025. Today the court denies the motion to vacate the default judgment.

BACKGROUND

Factual findings emerge from the evidence and testimony. Though this background roughly tracks a chronological presentation, with certain information from Mr. Rees interspersed [*e.g.* Tr. 79-194], the court emphasizes that it cannot credit significant portions of his sworn statements, particularly those without independent corroboration.

Mr. Rees's inability to recall certain information about his residence and activities, and information that most adults (and even many teenagers) could often easily recall or have the means to recall, presented as more deliberate than absentminded. His storyline was often implausible. At times he favored obfuscation rather than disclosure, and the court finds that the idea that his life has been so transient as to forget these details was more ruse than fact. At moments, there was real certainty in his testimony; during many other moments, his demeanor and manner of testifying shifted to reveal something less than unvarnished truthtelling. He was unusually evasive, equivocating, pivoting from direct questions by counsel or clarifications from the court, searching for answers rather than just stating them, or burrowing into proverbial rabbit-holes of irrelevant information—often signs of someone who would rather discuss anything but the point of the question.

To be fair, Mr. Rees also offered certain facts and made some admissions that deserve a measure of weight today. The high-water mark of his testimony was in his discussion of his medical care in early 2025 for what was no doubt to him, and understandably so, an upsetting medical condition. But his testimony was also rife with inconsistencies, notably concerning his relationship to and responsibility for the Florimond property, his vehicle of choice, and his whereabouts in the months surrounding the time of claimed service, such that creditable facts from him are found few and far between.

To start, Mr. Rees attested that he sold his home in New York in October 2023 and began living for short periods of time with friends in different states [Tr. 109; 37 ¶ 5]. Indeed, he told the New York federal court something similar in late 2024—that he lived a "nomadic existence, in other states, with no real fixed abode" for sixteen months [Ex. 38 at 6; *see also* Ex. 40 ¶ 17]. That he sold his home in New York is true. His story that he has peripatetically resided with friends in different states remains uncorroborated and disbelieved.

To the extent service was perfected in this case, it occurred at the Florimond home, so much of the evidence naturally focuses there. Mr. Rees reported that he stayed at the Florimond home sporadically after it was purchased in late 2023 [Tr. 136, 173-75]. His reports of his tenure there the court also finds incomplete.

On December 29, 2023, Mr. Rees signed an Indiana State Form 46021 Sales Disclosure relating to property at 2309 Florimond Avenue in Michigan City, Indiana [Ex. 9].[1] The buyer was listed as "Southpac Trust International, Inc. as Trustee of the IFLY Trust." Mr. Rees signed for

---

[1] The record variously describes the address as on Florimond Avenue, Florimond Drive, and Florimond Trail, as well as being in Michigan City or Long Beach, Indiana [*see, e.g.*, Exs. 9, 11, 29]. The parties make nothing of these differences, so the court treats them as mere scrivener alterations. Tax records show the property in Michigan City, Indiana within Long Beach Township, so the court adheres to this [Ex. 43].

the buyer, and the printed legal name underneath his signature was "Jonathan Rees a/k/a Greg Ellis, Special Trustee." Oddly, he testified that he has never been a trustee of this Trust [Tr. 180], and he offers no explanation how he was then authorized to sign, or even why he signed, the sales disclosure on its behalf.[2] That is a particular concern when knowingly falsifying information on a sales disclosure would constitute a level 5 felony in Indiana. *See* Ind. Code § 6-1.1-5.5-10(a).

Instead, Mr. Rees alluded generally to a trust attorney [Tr. 127] and said the Trust was organized offshore [Tr. 88]. The sales disclosure originally noted the Trust's address in the Cook Islands, except that this was crossed out to indicate instead that it was located at 2309 Florimond Avenue [Ex. 9].[3]

The sales disclosure twice said the planned use of the property was for a "primary residence," and the plan was that it would qualify for a homestead deduction (meaning it would need to be a primary residence). A homestead deduction could apply to an individual's "principal place of residence" that was owned by a trust, Ind. Code § 6-1.1-12-37(a)(2), *see also* Ind. Code § 6-1.1-12-17.9, meaning an individual's "true, fixed, permanent home to which the individual has the intention of returning after an absence," 50 Ind. Admin. Code § 24-2-5. The sales disclosure, as approved by the LaPorte County Auditor on January 9, 2024, showed that the deduction that would be applied (indeed the one applied for) was a homestead deduction.

---

[2] Mr. Rees testified that someone named Trevor (whose last name he could not recall) was a trustee of the Trust that owns the property [Tr. 180].

[3] "Southpac Trust International, Inc." seems to refer to a company called Southpac that provides "white glove" trust and related asset protection services based in the Cook Islands, Nevis, and New Zealand. *See generally* Southpac, http://southpacgroup.com, https://southpac.co.ck/, https://southpactrust.com/. The company offers various products, including offshore trusts ("the most robust, private, and secure legal structures for protecting assets," primarily used for "[h]igh-risk professionals, pre-divorce/litigation, estate planning, creditor protection"); use of "flexible corporate structures" like LLCs, international business companies, and offshore foundations to "manage assets, add layers of privacy, or hold investments;" and trustee and fiduciary services "to establish and manage your trust, act as a corporate director, or serve as a foundation council member." *See* Southpac, *Our Services*, https://southpacgroup.com/our-services/ (last visited Mar. 17, 2026).

In moments that were more Freudian slips than oversights, and in response to questions by counsel as to when he ("you") bought the Florimond home, at times in testimony Mr. Rees suggested he owned the home, though in others he clarified that a trust did [*compare* Tr. 129, 131 *with* Tr. 131, 170]. Mr. Rees claimed that he could use the Florimond home only sporadically with permission—from two people he could neither name nor identify [Tr. 181]. Rather notably, he had insider knowledge about the property's tax status and documentation related to it. He testified that a homestead deduction wasn't applied to the property in 2024, all per documentation [Tr. 90, 130]. A September 25, 2025 tax statement for the Florimond property seems to bear out his understanding—that the homestead deduction applied for "2023 pay 2024" and not for "2024 pay 2025" [Ex. 43 (Tables 1 and 5)].

Mr. Rees testified that he, not someone else, chose to put the utilities for the Florimond home in his fiancée's name (Laura Greenman Heine) [Tr. 92, 133]. He did so "to keep [his] name off any public record" [Tr. 133], but this merely re-raises the question why or how he had any say over who was responsible for the home's utilities, or why he was managing the property's affairs if he was a mere sporadic user. There is no evidence in the record as to precisely where Ms. Heine lived, though she reportedly lived elsewhere than Mr. Rees [Ex. 37 ¶ 8].

Mr. Rees testified that, in 2023, he was living in upstate New York, purchased a black Tesla, and registered the vehicle in New York [Tr. 86]. On January 30, 2024, soon after the Florimond home was purchased, the same Tesla (identifiable by its VIN) was registered with Indiana to the Florimond address, and reported as owned not by Mr. Rees but by a company called Morf LLC [Exs. 11, 12]. Morf LLC was organized on January 22, 2024 in Wyoming by Northwest Registered Agent Service Inc., without information about its members (not unusual and not unexpected in Wyoming) [Ex. 10]. *See Avus Designs, Inc. v. Grezxx, LLC*, 644 F. Supp.3d

963, 978 (D. Wyo. 2022). In February 2024, Mr. Rees surrendered license plates for the Tesla in New York [Ex. 12].

Mr. Rees testified that he transferred the Tesla to Morf LLC and did so to be "as private and confidential as possible" [Tr. 127]. But he never explained—and the record never shows—how he came to be aware of the LLC or the contours of his relationship with it. The record suggests he must have had some measure of control or influence. After all, Mr. Rees testified that he continued to use the Tesla (more precisely, he said "I have use" of it) [Tr. 183-84]. He drove the vehicle in both 2024 and 2025 [Tr. 184]. He said someone gave him permission in early 2024 to drive it, but he could not recall who that person was either [Tr. 184-85]. There was no evidence that anyone other than Mr. Rees had permission to access or use the Tesla in 2024 and 2025, much less that anyone other than him drove it.

On May 20, 2024, five months after the Florimond property was purchased and as summer neared, Mr. Rees applied for a membership at the Long Beach Country Club (LBCC) located in Long Beach, Indiana and officed in Michigan City, Indiana [Ex. 14]. The application listed a primary address in Geneva, Illinois—a property owned by his fiancée's relative [Tr. 172]—and a secondary address as "2309 Florimond, Long Beach, IN 46360" (poorly scrawled, and perhaps variably readable as either "2305" or "2309," but the court takes it as "2309"). The country club sat approximately 100 miles from the Geneva home [Ex. 15], and, according to Mr. Rees, 500 to 800 yards from the Florimond home [Tr. 124]. The application listed Mr. Rees's spouse as Laura Greenman (his fiancée). It noted that Mr. Rees was retired.

On May 22, 2024, Mr. Rees's LBCC membership application was approved [Ex. 16]. On May 24, 2024, Ms. Greenman signed an LBCC payment authorization form (signed as "Laura Heine") [Ex. 17]. For customer name, she wrote "Greg Ellis/Laura Heine (Greenman)," and for

customer address she wrote the Geneva, Illinois address. Much like the utilities, it seems that billing for the LBCC was placed largely in her name; after all, in June 2025, Mr. Rees asked LBCC to remove her credit card because she would no longer be responsible for payments [Ex. 52].

From May 2024 through June 2025, based on account statements from the country club, Mr. Rees incurred various charges on his country club account, including fees, dues, golf-related expenses, and food and drink charges [Ex. 26; Ex. 27 ¶ 3-4]. The statements for May through August 2024 and March through August 2025 list Mr. Rees's address as "2305 Florimond," whereas those for September 2024 through February 2025 list the Geneva, Illinois address. Though Mr. Rees points out this address discrepancy [Tr. 151], neither side suggests a property at 2305 Florimond Avenue is material to this case, and this can easily be chalked up to an error on the country club's part in deciphering the precise number from the application.

Mr. Rees provided the court with what he claimed to be his account statements from May 2024 through August 2025 [Ex. 80] that he says he received monthly from the country club [Tr. 147]. He says, and Ms. Doe doesn't contest, that the charges therein are generally the same as those in LBCC's statements [Tr. 148], though minor discrepancies result in different totals for two of the sixteen months (the total receivable for statements ending August 31, 2024 and January 31, 2025) [*compare* Ex. 26 *with* Ex. 80]. Other information on the statements differs too—Mr. Rees's copies contain only the Geneva, Illinois address (until April 2025), and contact information for LBCC staff lists some different personnel. Mr. Rees testified that some of the personnel noted in Ms. Doe's statements had not yet been hired as of the dates of the statements on which they are listed [Tr. 153], but he introduced no evidence to support this. Mr. Rees described these discrepancies as "inexplicabl[e]," "drastic," and "fishy," and he surmised that someone decided or was directed to change the statements that were produced to Ms. Doe [Tr. 151, 153-54].

7

Though the financial statements reflect fairly regular activity in May through October 2024 and in May 2025 (regular meaning transactions on at least eight days in a month), they show notably less activity in November 2024 through April 2025 [Ex. 28]. Less activity in the winter or early spring months in northern Indiana would not be unusual. The only activity in February 2025 was on February 15. Mr. Rees testified that he wasn't the only person who charged his account [Tr. 136]. He claimed to remember a couple of times in which friends, guests, and local members (though he never says his fiancée) charged his account, sometimes as "banter," and said this means charges on a given day would not necessarily signify his presence at the country club [Tr. 136-37]. He left ambiguous how often this occurred. He also testified that, most times when he charged things, he was visiting the club for the day from Illinois or another state without spending the night at the Florimond property [Tr. 137]. Mr. Rees remained an active member at the country club until at least mid-May 2025 [Ex. 24].[4]

Mr. Rees spent time in the Long Beach area. On October 26, 2024, he received a warning for speeding in Long Beach [Ex. 29 at 6; Ex. 37 ¶ 11]. On November 12, 2024, Deputy Marshal Matthew Vopat of the Long Beach Police Department, seeking to serve Mr. Rees with a New York felony arrest warrant, observed a vehicle leave the Florimond property, followed it, and ultimately conducted a traffic stop in New Buffalo, Michigan [Ex. 29]. Body camera footage shows Deputy Marshal Vopat exit his vehicle, approach a black Tesla driven by Mr. Rees and registered to the Florimond property, and confirm Mr. Rees's identity [Ex. 31]. It shows Deputy Marshal Vopat attempt to serve Mr. Rees, Mr. Rees refuse service repeatedly, and Deputy Marshal Vopat place the documents on the driver's door, tending reliably to corroborate the impression

---

[4] Mr. Rees applied for a leave of absence from the country club for a year (May 15, 2025 through May 15, 2026) [Ex. 24]. The country club approved this leave on August 16, 2025.

that Mr. Rees's demeanor changed from cooperative to argumentative the moment he discovered he would be served with process.

On December 20, 2024, Mr. Rees was arraigned in a criminal proceeding in Chenango County, New York [Ex. 39]. He declined to state his address on the public record but agreed to provide it *in camera*. Mr. Rees testified at the evidentiary hearing here that he gave the Chenango County court the Geneva, Illinois address [Tr. 190], but there is nothing to corroborate this.

When asked at the hearing where he was registered to vote, Mr. Rees unnecessarily waffled. He initially said he assumed it was either in New York or California, but when asked to clarify his need to assume this, he said he was registered in Illinois in 2024 and 2025 [Tr. 183]. After the hearing, Ms. Doe filed an affidavit from Jake Radde, director of operations at Radde Investigative and Security Agency, who said he searched public records and was unable to find an Illinois voter registration record for Jonathan Rees or Greg Ellis [49-2]. This prompted Mr. Rees to file another affidavit explaining that he experienced some "initial confusion" during his testimony and that he was last registered in California, not Illinois [52-1 ¶ 3-5]. He attached a document—possibly a screenshot or downloaded webpage—that purports to show an "inactive" voter registration for a Jonathan Rees from Culver City, California. There is no date, URL, state insignia, or other information to demonstrate that this was indeed the last place where he was registered to vote, or that even it was in 2024 or 2025. He claimed in his new affidavit that he was never registered to vote in Indiana. Nothing corroborates this either, and one who would so easily dither about something as simple as voter registration the first three times likely could not be trusted to recall the fourth time. In short, Mr. Rees supplied no information explaining his voter registration status in 2024 or 2025, nor did Ms. Doe.

Mr. Rees testified that he has a driver's license in his name that lists his address on West Roscoe Street in Chicago, Illinois [Tr. 112-13]. Ms. Doe attempted to serve Mr. Rees at that address on February 11, 2025, but the process server was unable to effect service there [Ex. 2]. Mr. Rees never explained his relationship to this property and never claimed he was living there in 2025. He was evasive about whether he knew the person who answered the door and who told the process server that Mr. Rees did not live at that address [Tr. 113].

Mr. Rees submitted two affidavits dated July 8, 2025 and August 20, 2025 that offered statements that might seem to distance him from the Florimond property [Exs. 36, 37], though some were notably stated in the present tense after certain changes to his lifestyle. He said he never resided at the Florimond property [Ex. 36 ¶ 5], that he "do[es] not receive mail" there [*id.* ¶ 6], that it was not his dwelling house or usual place of abode [*id.* ¶ 4], and that he did not personally own the property [Ex. 37 ¶ 4]. He claimed not to have a personal vehicle registered in Indiana, not to be registered to vote in Indiana, not to have filed an Indiana state income tax return, not to have received a homestead deduction for the Florimond property, and not to be a member of the LBCC [Ex. 36 ¶ 8-9; Ex. 37 ¶ 4, 7, 9, 17]. And he made various other assertions disclaiming certain ties to Indiana [Ex. 37 ¶ 18-27].

Only certain of these have been corroborated or remain otherwise unchallenged on this record, and certain of these from the record present as half-truths. For instance, Mr. Rees may not have been a member of the LBCC when he signed one affidavit, but he was before—indeed he was until four days before he signed the affidavit as only then the LBCC granted his leave of absence—and he was at the time of the attempted service. He was accurate in saying he had no vehicle registered in Indiana, though this passed over the many realities related to this Tesla. He was on face value accurate in saying the Florimond property was owned, at least in name, by a

10

Trust, though this too glossed over many other realities about its purchase and his involvement. He was right to say the Florimond property received no homestead deduction for 2024 pay 2025, but he left wholly unanswered both when and why this occurred after the auditor affirmed it in January 2024—*i.e.*, whether the deduction was removed before February 2025 or only after attempted service that month, closer to May 2025. Of course, in May 2025, Mr. Rees also began the process of cancelling his membership at the country club [Exs. 21-23]. Paired with his equivocation and evasiveness on the stand, it comes as little surprise that his affidavits often raise more concerns of credibility than always provide real answers.

Investigator Jake Radde (as it turns out the junior in a uncle and nephew team at Radde Investigative and Security Agency) testified at the hearing about his attempts to serve Mr. Rees at the Florimond property [Tr. 15-40]. Mr. Radde first attempted service there on February 13, 2025 at 7:50 a.m., though he says he was unsuccessful [Ex. 1]. His affidavit of service notes that vehicles were present at the residence and that no one would answer the door. He testified that he saw a black vehicle in the garage consistent with a Tesla [Tr. 19-20].

Mr. Radde's second attempt—the purported successful service for this case—occurred on February 21, 2025 at 7:27 a.m. [Ex. 2]. His affidavit describes a conversation with a man through a Ring doorbell camera. When Mr. Radde inquired about Mr. Rees, the man was hesitant to answer questions but twice responded "he does not live here." In testimony, Mr. Radde augmented his proof of service (which, in fairness, offered little more space for written description) by reporting that the man also said, "he is not home," "I don't know him," "[d]on't leave these documents here," and "[t]he subject is not at the house" [Tr. 24]. Mr. Rees later testified that he wasn't the man who spoke to Mr. Radde through the doorbell camera, nor does

he know who the man was [Tr. 156-57]. Mr. Radde attached the summons to the Florimond home's front door and took a photograph [Ex. 2].

According to an affidavit, service was later mailed by Ms. Doe's counsel to Mr. Rees's last known address by first class mail [Ex. 3 ¶ 7]. Though the affidavit doesn't state the address to which counsel mailed service, counsel represented during oral argument that he effectuated service by mail on three addresses, one of which was the Florimond address [Tr. 227-29]. That service was mailed to these three locations was not meaningfully challenged.

Mr. Rees says he never received the summons and complaint that Mr. Radde left at the Florimond property on February 21, 2025 and that he learned of the lawsuit only on April 21, 2025 when he received a phone call from a selling realtor for the Florimond property, who told him attorneys were requesting documents related to the sale [Tr. 157-58].[5] Mr. Rees never explained why the realtor selling the property, who was concerned about this call, would have any reason to alert Mr. Rees of the inquiry. For Mr. Rees's part, he never acted as someone who had only an arm's-length relationship with the Florimond property. Instead, in his words, he "informed the realtor that [he] would [speak] with a Michigan City real estate attorney" (who was handling the property's sale), and he "followed up immediately" and requested that the attorney get back to him, not someone else. Nevertheless, Mr. Rees claims it was then that he learned of this lawsuit, searched for counsel, and spent more time at LBCC as he met with attorneys [Tr. 158-59]. He said this activity explains the increased frequency of charges on his country club account statements in May 2025 [Tr. 159-60].

---

[5] The United States Marshal Service delivered a copy of the prejudgment order of attachment to the Florimond home on March 24, 2025 [Dkts. 17-18]

In late January 2025, a physician raised concerns about Mr. Rees's health, and Mr. Rees says he had a series of medical appointments in February, March, and April [Tr. 139]. He offered exhibits to substantiate certain appointments, some of which he described as screenshots from a medical provider's application [Tr. 139-40], or perhaps from their appearance strike as snippets from his phone or electronic calendar [Ex. 67]. These appointments—including an outpatient procedure on February 11, 2025 (which might require brief monitoring and then modest rest at home) [Ex. 66], a single-day procedure and consult on February 18 [Exs. 68-70], and outpatient visits on March 5, 19, and 20 [Exs. 74, 78, 79]—appear to have been at Delnor Community Hospital in Geneva, Illinois, or perhaps through services provided by GI Alliance of Illinois in Chicago, Illinois, or at other affiliates of Northwestern Medicine or Illinois Gastroenterology Group, which are generally based in the greater Chicago area.[6] Mr. Rees expressed his belief that Delnor Community hospital was located in St. Charles, rather than Geneva [Tr. 140], but the court accepts this as just an innocent mistake given that Northwestern Medicine has other affiliate locations in St. Charles. Mr. Rees also provided four screenshots he said came from his credit card statement [Exs. 71-73, 75; Tr. 141]—three on February 21, 2025 and one on March 17, 2025—though their origin proves difficult to discern merely from the images.

These documents are in respects unusual. They are apparently screenshots—possibly from emails, smartphone apps, interfaces for messaging with a medical provider, or an electronic calendar—and some appear substantially cropped. Other relevant information has been redacted, including for example his primary care physician and referring physician to know where he

---

[6] Though some exhibits don't state the name of the medical facility, many contain markings or abbreviations reflecting association with Northwestern Medicine [Exs. 65, 66, 69, 74, 77, 78]. Delnor Community Hospital appears to be affiliated with Northwestern Medicine.

normally received medical care [Exs. 69-70]. Many lack the indicia of legitimacy or reliability often seen in fully rendered emails and electronic messages, mailings, credit card history, or financial statements. That is not to say they appear false or doctored, as the court accepts them at face value, but they strike as piecemeal.

Mr. Rees testified broadly about his whereabouts in early 2025, but he appeared deliberately to avoid specifics and seemed dedicated to sharing vague or ambiguous answers. To the extent he did answer, his responses often were couched, later shifted, or were braced with protestations that he could not recall specifically or would have to check his calendar. The court cannot, and does not, expect a person to recall each day of one's living arrangements, though generally people would be able to say where they had been living a mere eight months before one's testimony and provide some measurable evidence of this. Mr. Rees vacillated from saying he hunkered down in Illinois (to see to his medical care or recuperate) to saying he actively "mov[ed] around" because of a supposed imminent threat posed by an associate of Ms. Doe.[7] He claimed to be "in and out" of the hospital but offers no more corroboration of this. Incredibly, among many odd representations, he testified that he made notes of every time he went to Indiana and the times he stayed overnight [Tr. 173], yet never explained why he would ever need to do so and never presented these notes at the evidentiary hearing or afterwards, though they might well be material. No witnesses corroborated Mr. Rees's presence in Illinois, or anywhere else other than in Michigan City or Long Beach at or near the Florimond home.

---

[7] Fo instance, Mr. Rees testified that he also spent no more than three or four days in each of Florida and New York in January 2025 [Tr. 171-72], some time in New Jersey during the first five months of 2025 [Tr. 185], and another eight or nine days in Miami that May or June [Tr. 186]. His stay in New York was temporary and for a court hearing [Tr. 172]. He did not consider the place he stayed in New Jersey to be his home, though he did consider the place in Florida to be his home "[f]or the short time [he] was there" [Tr. 186]. The court finds these stays to be nothing but temporary visits on this record.

During his testimony, Mr. Rees added to the conflicting account of his relationship to and responsibility for the Florimond property. He said two individuals gave him permission to use it and he would let them know of his use (at least for a time) [Tr. 180-82]. When asked, he could not provide their names and said he did not know who they were, though he shared that he would send a message to one, who would inform the other. He said he was given information or protocols for using the property by someone (whom he did not name) affiliated with the Trust and his ("my") manager (whom he did not name) of an unspecified "trust company" [Tr. 181-82]. He did not explain why the property was subject to this peculiar arrangement.

At the same time, though Mr. Rees might suggest arm's-length responsibility for the property, he acted in other respects as more owner. For instance, he discussed personally checking on the property over concerns like landscaping and strangers on the grounds [Tr. 177]. On landscaping, Mr. Rees said there was an incident in which neighbors were unhappy with branches growing over a fence [*id.*]. Here, his storyline became more broken as he realized his revelation of a personal investment in caring for the Florimond property. He explained that he occasionally spoke with a person responsible for the property's upkeep; once more he could not give that person's name but said he did not live in Indiana [Tr. 178]. He said this person liaises or contracts with a landscaping and trash service that Mr. Rees was referred to by a man named Jim (last name unknown) from the country club [Tr. 178-79]. He claimed the Trust paid for this service [Tr. 179].

On strangers at the Florimond property, Mr. Rees testified animatedly and forcefully about an August 23, 2025 incident in which he was notified that a trespasser was photographing the property, that the neighbors and police chief were concerned, and he "deemed it necessary to return to the home" [Tr. 160-62]. Mr. Rees drove three hours from out-of-state to investigate

the report, then interacted with John Radde, the elder investigator at Radde Investigations, who Mr. Rees had observed driving by the home the day before and who was reported to Mr. Rees to be at the home again on August 23 [Tr. 41, 162]. By comparison, Mr. Rees appeared unconcerned to learn that persons purportedly unknown to him were present at the Florimond home when they attempted to serve him there on February 21 and June 5, 2025 (or that "another person" was in the home on February 21) [Tr. 157].

Why Mr. Rees was the one speaking with the police chief about a property he apparently did not own was unexplained [Tr. 187-88]. Mr. Rees said his arrival was photographed by John Radde [Tr. 43, 161-62; Ex. 7]. Mr. Rees shared, without further explanation, his suspicion that the incident was part of "some bigger . . . play" to lure him to the property and get a picture of him [Tr. 161]. When invited to explain the curiosity of why he would be concerned with the Florimond property—if he did not own or care for the home—Mr. Rees feebly offered the theory that he would want to assist if no one was there [Tr. 188].

Later in 2025, Jake Radde (the junior investigator) also attempted to serve Mr. Rees at the Florimond address related to another lawsuit [Tr. 30-31]. His affidavit reports he was unsuccessful in May 2025, but he ultimately attached the summons to the door on June 5, 2025 and took photographs [Ex. 5]. Mr. Radde again spoke with a man through the doorbell camera. When asked for Mr. Rees, the man responded, "He is not home," and then asked for information about the court documents and attorneys, and requested the documents be placed in the mailbox. Mr. Radde told the man that he had been hired by SouthBank Legal and declined to read the documents. He returned to his office and mailed a copy of the summons to the Florimond address by first class mail.

The junior Radde's testimony at the evidentiary hearing was consistent with his account in his affidavit [Tr. 26-40]. Additionally, he "imagine[d]" that the person he spoke with on June 5, 2025 was the same person he spoke with before on February 21, 2025, but noted the voice was "distorted" this time [Tr. 31]. Whatever degree of identification this offers, it isn't material. Mr. Rees testified that he was not the person communicating with Mr. Radde through the doorbell on either occasion, though on balance, for reasons soon explained, this offers no credible rebuttal to service on February 21, 2025 [Tr. 157]. Mr. Rees filed an answer in this other action, a foreclosure action pending in state court in LaPorte County; he did not expressly contest validity of service, though he denied the court had personal jurisdiction over all parties [Ex. 6 ¶ 4].

DISCUSSION

The court "may set aside a final default judgment under Rule 60(b)." Fed. R. Civ. P. 55(c). Relief under Rule 60(b) is "an extraordinary remedy . . . granted only in exceptional circumstances." *Davis v. Moroney*, 857 F.3d 748, 751 (7th Cir. 2017) (quoting *Bakery Mach. & Fabrication, Inc. v. Traditional Baking, Inc.*, 570 F.3d 845, 848 (7th Cir. 2009)). Such circumstances include when the "judgment is void," Fed. R. Civ. P. 60(b)(4), in which case "the trial judge has no discretion and must grant the appropriate Rule 60(b) relief," *Philos Techs., Inc. v. Philos & D, Inc.*, 645 F.3d 851, 855 (7th Cir. 2011). "A judgment entered against a defendant over whom the court had no jurisdiction is void, and no court has the discretion to refuse to vacate that judgment once it recognizes its lack of jurisdiction." *Id.*; *see also Coney Island Auto Parts Unlimited, Inc. v. Burton*, 146 S. Ct. 579, 585 (2026) (assuming timeliness).

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Vanegas v. Signet Builders, Inc.*, 113 F.4th 718, 728 (7th Cir. 2024) (quoting *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104

(1987)); *see also Homer v. Jones-Bey*, 415 F.3d 748, 752 (7th Cir. 2005) ("a movant may attack the judgment for lack of jurisdiction over the person at any time since a judgment rendered without jurisdiction over the person is void") (cleaned up). By federal rule, an individual may be served by "following state law for serving a summons . . . in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1).

In Indiana, service "may be made upon an individual" by "leaving a copy of the summons and complaint at his dwelling house or usual place of abode," then "by first class mail, [sending] a copy of the summons and the complaint to [his] last known address" and listing this fact "upon the return." Ind. Tr. R. 4.1(A)(3), (B). Both sides have duties in this. On one hand, for any proceeding that merits being treated as final, a fundamental prerequisite of due process is notice, reasonably calculated under all the circumstances to apprise interested parties that an action pends, to afford them an opportunity to be heard. *See Norris v. Pers. Fin.*, 957 N.E.2d 1002, 1009 n.5 (Ind. Ct. App. 2011). And on the other, the law imposes a duty on "every person being served under the[] rules to cooperate, accept service, comply with [the] rules, and, when service is made upon him personally, acknowledge receipt of the papers in writing over his signature," Ind. Tr. R. 4.16(A), though service must always comport with due process, *Swaim v. Moltan Co.*, 73 F.3d 711, 720-21 (7th Cir. 1996).

Generally, service shall not "be set aside or be adjudged insufficient" when it is "reasonably calculated to inform the person to be served that an action has been instituted against him, the name of the court, and the time [] to respond." Ind. Tr. R. 4.15(F); *see Norris*, 957 N.E.2d at 1009 n.5.[8] A method of service "is sufficient if no other method better calculated to give notice

---

[8] This Indiana rule, however, "only cures technical defects in the service of process, not the total failure to serve process." *LaPalme v. Romero*, 621 N.E.2d 1102, 1106 (Ind. 1993); *see also Homer*, 415 F.3d at 757.

is available but is insufficient if another method obviously better calculated to give notice is available." *Mueller v. Mueller*, 287 N.E.2d 886, 889 (Ind. 1972); *see also id.* (citing *Walker v. City of Hutchinson*, 352 U.S. 112, 115-16 (1956); *Mullane v. Cent. Hanover Bank & Tr.*, 339 U.S. 306, 314-15 (1950); *McDonald v. Mabee*, 243 U.S. 90, 92 (1917)). Service is sufficient if it meets "basic due process requirements for notice," so if service is reasonably calculated to inform a party of the suit, "the fact that the party served lacks actual knowledge of the suit does not defeat the jurisdiction this acquired." *Glennar Mercury-Lincoln, Inc. v. Riley*, 338 N.E.2d 670, 675 (Ind. Ct. App. 1975); *accord Swaim*, 73 F.3d at 720-21.

Mr. Rees challenges personal jurisdiction on the basis that he wasn't properly served. A signed return of service, which, depending on the means of service, identifies a recipient or when and where service occurred, is "*prima facie* evidence of valid service." *Durukan Am., LLC v. Rain Trading, Inc.*, 787 F.3d 1161, 1163 (7th Cir. 2015) (citation omitted); *see also Relational, LLC v. Hodges*, 627 F.3d 668, 672-73 (7th Cir. 2010); *Homer*, 415 F.3d at 754; *O'Brien v. R. J. O'Brien & Assocs., Inc.*, 998 F.2d 1394, 1398 (7th Cir. 1993). Ms. Doe submitted two signed returns of service. Only the second, she says, reflects proper service when her investigator left the summons and complaint at the Florimond home. Mr. Rees calls this return facially defective because it fails to report that the complaint and summons were thereafter sent by mail to his last known address. But before entry of default, Ms. Doe cured this by attesting that the complaint and summons were mailed to his last known addresses, including, as counsel reports, to the Florimond home (and this would reasonably afford notice too for any technical defect that might linger).

At this point, "the burden shifts to the defendant to demonstrate that service was not received." *Homer*, 415 F.3d at 752; *see also id.* at 754 (the "presumption and burden-shifting scheme makes sense" when the return of service specifies an address or receiving individual). To

meet this burden, the defendant must present "strong and convincing evidence" to rebut the presumption of service. *Durukan*, 787 F.3d at 1163 (citation omitted); *Relational*, 627 F.3d at 673. The court may weigh the evidence and assess credibility in deciding whether this burden has been met. *Relational*, 627 F.3d at 673. Should he carry this burden, "the party asserting personal jurisdiction . . . must prove what it has alleged." *Durukan*, 787 F.3d at 1163-64; *accord Homer*, 415 F.3d at 758 ("the burden of demonstrating the court's personal jurisdiction over [the defendant] remains squarely on [the plaintiff]").

Mr. Rees says service never occurred at his dwelling house or usual place of abode. The term "dwelling house or usual place of abode" isn't found exclusively in Indiana law. It harkens back to former federal Equity Rule 13, which permitted service at a defendant's "dwelling house or usual place of abode." 4 Wright and Miller, *Fed. Prac. and Proc.* § 1061 n.1 (4th ed. 2015) (providing text of the old rule). "Despite the length of time these words have been a part of federal practice, the judicial decisions do not make clear precisely what they mean and the facts of a particular case often prove to be crucial. . . . The majority of cases interpreting the words in the context of determining the validity of service of process appear to have focused on their literal meaning." 4A Wright and Miller, *Fed. Prac. and Proc.* § 1096 (4th ed. 2015); *see also Grecco v. Campbell*, 386 N.E.2d 960, 962 (Ind. Ct. App. 1979) (citing Allen E. Korpela, Annotation, *Construction of Phrase "Usual Place of Abode," or Similar Terms Referring to Abode, Residence, or Domicile, as Used in Statutes Relating to Service of Process*, 32 A.L.R.3d 112 (1970)) ("Although there are innumerable decisions from other jurisdictions construing substantially similar language, those cases are in hopeless and irreconcilable conflict and provide little guidance.").

Indiana courts do not define "dwelling house or usual place of abode," or the words in the phrase, when discussing Rule 4.1(A)(3). Rather, when evaluating whether a home is a person's

dwelling house or usual place of abode, they engage in an "extremely fact-sensitive" inquiry. *Norris*, 957 N.E.2d at 1007 n.4 (citing cases); *Doyle v. Barnett*, 658 N.E.2d 107, 109 (Ind. Ct. App. 1995) (question "turns on the particular facts of each case"). For example, in *Doyle*, 658 N.E.2d at 109, the defendant's father's address was his "usual place of abode" because he received mail there, listed it on his driver's license and on an accident report, and maintained this address on his insurance. Likewise, in *Grecco*, 386 N.E.2d at 962, though the defendant was temporarily staying with relatives for five weeks at the time of service, service was proper at his home where he lived before and after. In contrast, service at one's former residence would be insufficient. *See, e.g.*, *Troxel v. Ward*, 111 N.E.3d 1029, 1034 (Ind. Ct. App. 2018) (home "not his dwelling house or usual place of abode" when process server received no response in four visits, stated property was vacant with no one living there, and locals told him defendant had moved weeks earlier); *Chesser v. Chesser*, 343 N.E.2d 810, 812 (Ind. Ct. App. 1976) (home vacated three days before service not "dwelling house or usual place of abode").

A dwelling denotes a "place of residence; a dwelling-place, habitation, house." *Dwelling*, Oxford English Dictionary sense 3 (last visited Mar. 17, 2026). Though the definition of abode strikes as similar—a "place of ordinary residence; a dwelling place; a house or home," *Abode*, Oxford English Dictionary sense 4 (last visited Mar. 17, 2026)—judicial gloss on the phrase "usual place of abode" is instructive. "When the law provides that notice may be posted on the 'front-door of the party's usual place of abode,' in the absence of the family, the intention evidently is that the person against whom the notice is directed should then be living or have his home in the said house. He may be temporarily absent at the time the notice is posted; but the house must be his usual place of abode, so that, when he returns home, the copy of the process posted on the front-door will operate as notice; which is all that the law requires." *Earle v.*

*McVeigh*, 91 U.S. 503, 508 (1875); *see also Abode*, Oxford English Dictionary sense 3 (last visited Mar. 17, 2026) ("The action of dwelling or living permanently in a place; habitual residence. Frequently in place of abode.") (emphasis omitted).[9] After all, the defendant's place of abode must be his "usual" one—one he ordinarily or customarily uses. *Usual*, Oxford English Dictionary sense 3.a.i. (last visited Mar. 17, 2026) ("Ordinarily used; constantly or customarily employed; in common use; ordinary, customary.").

Traditional reading of the disjunctive "or" in the phrase "dwelling house or usual place of abode" indicates that each part—"dwelling house" versus "usual place of abode"—has a separate meaning, even if slight, particularly when "usual" precedes the latter phrase only. *See United States v. Woods*, 571 U.S. 31, 45 (2013); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise[.]"). To read them synonymously would render one superfluous or void of all its independent significance. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Based on these authorities and the plain meaning of these two phrases, the court takes "dwelling house" to mean where the person is living at the time of service and "usual place of abode" to mean the home where one can ordinarily be expected to be found living to reasonably give notice of a lawsuit. Such an interpretation gives meaning to both concepts and conforms with what one would expect for service at a residence—that it should be made at the place where

---

[9] *See also First Nat'l Bank & Tr. Co. v. Ingerton*, 207 F.2d 793, 794-95 (10th Cir. 1953) (recognizing "that the word 'usual' has significance" and finding that, after transitory defendants sold their home and moved into a hotel for about a year, the hotel "became their principal place of abode" because they had their personal belongings and some of their furniture there, and they received mail there, even though they rented a house elsewhere for a month and spent some time there); *Nat'l Dev. Co. v. Triad Holding Corp.*, 930 F.2d 253, 257-58 (2d Cir. 1991) (concluding that a person can have two or more "'dwelling houses or usual places of abode,' provided each contains sufficient indicia of permanence, and deciding defendant's apartment had sufficient indicia of permanence because he owned it, furnished it, spent considerable money remodeling it, and listed it as one of his residences in a bail application).

22

a person currently resides or the place he typically inhabits. For many, the two are the same, for they live in and are ordinarily found at only one home. But if a person is staying in a vacation home or temporarily staying at another place, for example, his dwelling house will be where he lives today, and his usual place of abode will be the residence where he would customarily live or return. *See, e.g.*, *Grecco*, 386 N.E.2d at 962. Mr. Rees seems to recognize this same intention and thus differentiates the terms the same, even if in an inverted way [Tr. 219-21].

Mr. Rees provided an affidavit saying the Florimond property "is not [his] dwelling house or usual place of abode" [Ex. 36 ¶ 4], but this is a mere legal conclusion, and one the court need not accept at face value, particularly when his testimony at the hearing so squandered his credibility that the only statements the court credits from him are those corroborated by a reliable or independent source or are otherwise demonstrably trustworthy. In the end, this record does not offer "strong and convincing" evidence to rebut the presumption of service at the Florimond home as his dwelling house or usual place of abode.

The court cannot rely on Mr. Rees's testimony alone because it was inconsistent, evasive, and often implausible. A person can often account for his whereabouts just months before, but Mr. Rees couldn't, at least not in any convincing measure. The court is careful not to expect too much. But one would expect that a man whose connection to a property is the primary early issue in a lawsuit would be prepared to establish his relationship with that property—especially if he claims (as Mr. Rees does) to have a written record of his visits there—and clearly explain where he lived instead. The song and dance that he lived transiently during this time, which might explain someone else's difficulty in being more precise about their past circumstances, was not compelling here. Mr. Rees couldn't give a straight or credible answer about where he lived at nearly any time, including at and around the time of service. What is clear is that the only two

real candidates for his dwelling house or usual place of abode were either the Florimond home in Indiana or the Geneva one in Illinois (or both), as any other was conspicuously unverified and decidedly temporary even at that. Though the court finds that Mr. Rees shortchanged the frequency, even he admitted that, in any given month in early 2025 (including February), he would be recurrently at the Florimond home, even if for a day or two. He thus would have been able to see documents in the mailbox or otherwise left at the home within a reasonable time.

The Florimond home was his dwelling house or usual place of abode, even if his account of his relationship with the property was convoluted. He worked to distance himself from the property when it was obvious to him that this would be to his advantage, then slipped at times to reveal closer connections with the home, only to try immediately then to walk them back. For one, Mr. Rees emphasized that the Florimond home was owned not by him, but by a trust. He certainly knew a lot about the Trust—where it was organized, what it paid for, whether it took certain tax deductions for the property, and so on—in an odd degree of detail for someone with a supposed distant or even arm's-length relationship to it. He emphasized that he was not a trustee, though he signed the sales disclosure—submitted thereafter to county authorities—as "Special Trustee" (leaving unexplained the seeming disconnect).

No one provided the trust documents, but the court well knows that putting one's home in trust is not uncommon. Indeed, even Indiana law contemplates that this could be done and the home still used as the individual's primary residence. Southpac provides services that include offshore trusts to protect assets and add layers of privacy, and even Mr. Rees testified that he looked to hide (albeit for different reasons, he says, than to evade service). A special trustee is a lesser used role, but as a term of art it refers to an individual specially designated by the trust "with authority over a particular asset of the trust . . . , with the other trustee bearing all other

responsibilities and powers associated with the trust." George G. Bogert *et al.*, *Bogert's The Law of Trusts and Trustees* § 137 (2025). Mr. Rees represented himself to be just such a special trustee, and the sales disclosure stressed the importance of being truthful. In short, the sales disclosure tends to demonstrate that Mr. Rees had authority over the particular asset that was this Florimond home rather than tends to show that this was not a home available for his every use. He would have no authority to act on this sales disclosure otherwise.

For someone who professed to be nomadic in his living habits, for someone who claimed not to be a trustee of the Trust, and for someone who reportedly had to get permission to stay at this property for sporadic use, Mr. Rees sure had intimate knowledge—knowledge unusual to a mere sporadic user—about the property's tax situation over the course of 20 months (January 2024 to September 2025). The same sales disclosure verifies that the home was intended as a primary residence. Twice he verified that the planned use of the property was for a "primary residence," and the auditor memorialized this application in January 2024 so that the property could qualify for a homestead deduction (owned by a trust but used as an individual's primary residence). *See* Ind. Code § 6-1.1-12-37(a)(2); *see also* Ind. Code § 6-1.1-12-17.9; 50 Ind. Admin. Code § 24-2-5.

Mr. Rees testified that the homestead deduction was zero in 2024 pay 2025, and that "it's always been zero" [Tr. 132]. That seems accurate only halfway. Through his authorization, the Trust originally applied and qualified for the deduction, so someone must have later scrutinized it, deemed the property ineligible, and disclaimed the benefit. Mr. Rees confessed that he was the one who investigated and determined the property would not qualify [37 ¶ 6], so it seems he was involved in seeing to the change, which once more tends to show his strong connection to the

25

property. Based on this record [Ex. 43] and after examining judicially noticeable county records, the court agrees that the homestead deduction was zero in 2024 pay 2025.

The interesting question is the timing of this change. The records show the Florimond property's taxes were timely paid in spring 2024, but the fall 2024 bill was delinquent and only paid late (along with a ten percent penalty) with the spring 2025 bill (via a May 9, 2025 lockbox payment) [Ex. 43].[10] The sort of scrupulous or assiduous man who researches and renounces a property tax deduction the auditor says applies would tend not to be a person who would forget to pay taxes for a trust on time, or at least would pursue a payment plan with the county. The late payment, notably after service at the Florimond property on February 21, 2025 (and after service of the prejudgment attachment order by the USMS on March 24, 2025), makes the prospect that he strategically renounced the trust's homestead deduction to dissociate from the property all the likelier. And he offers no evidence to show the change occurred sooner.

The arrangement Mr. Rees claimed to have with the Trust, in which he purportedly received permission to use the home, from persons he cannot identify, was as doubtful as it was Rube Goldberg-ian, particularly absent whatever written notes of his stays he obviously withheld. Even he admits he used the home, and the investigator twice talked to a man through the door, including on February 21, 2025. The record is utterly silent about anyone else's use of the home, at least anyone identifiable, except for Mr. Rees. For someone so intimately familiar and concerned with the status of the home and the goings-on there, and proverbially on speed dial with people as far ranging as a real estate agent and police chief, Mr. Rees would reasonably know

---

[10] The ten percent penalty likewise underscores that this delinquent tax was paid after December 10, 2024 [Ex. 43], and the delinquent tax reflected in the record matches to the penny with the missed fall 2024 payment. *See also 2309 Florimond Ave., Michigan City, IN 46360, Pay Years 2024 & 2025*, LowTaxInfo, https://lowtaxinfo.com/laportecounty/1041971-2024 and https://lowtaxinfo.com/laportecounty/1041971-2025 (last visited Mar. 17, 2026).

of others using the home. No mere infrequent visitor seeks out groundskeeping recommendations from his country club acquaintances or travels three hours from out-of-state to meet with the police about a lurking photographer. Mr. Rees's concerns for the Florimond home's security and care go well beyond the ken of an overnight guest or drop-in lodger.

If Mr. Rees were believed, it would be odd to learn that the property's utilities were in his fiancée's name, but so they were. Her connection to the Trust or to the Florimond property is wholly unexplained. It is not even clear that she visited or stayed at the home, and Mr. Rees attested in one affidavit that he does not live with her.[11] The only rational explanation is her relationship to Mr. Rees, who seems to have used her identity as a tool to keep his location out of the public record. But why would it be necessary to put utilities (which apparently he need not pay) for a home (where he reportedly does not live) in the name of a person close to him (his fiancée of all people) so he could hide, if the home was not where he was living? This too tends to show the home was in fact his dwelling house or usual place of abode.

Other of his affidavit statements and testimony bolster the instinct to meet his word with skepticism, such as his inability during and after the hearing to communicate his voter registration history and status, or to try to steer—inaccurately as it turns out—this to Illinois. Or the ease with which he claimed to remember the timing and duration of some of his scheduled travel in other states contrasted with his difficulty remembering his stays in Indiana. All this is to say, when Mr. Rees swears in an affidavit that the Florimond home isn't his dwelling house, usual place of abode, or residence, or when questions extract, like a stubborn molar, only his vague recollections

---

[11] Mr. Rees merely said in his affidavit that the utilities were in the name of "another person," not specifying his fiancée, but testimony revealed they were one and the same.

of where he lived in January, February, and March 2025—hazy on dates and addresses, yet absolutely certain it was not at the Florimond home—the court credits him not one iota.

Under oath, and only as of July 9, 2025 and again on August 20, 2025, he said he "do[es] not receive mail" at the Florimond address, but this present tense couching fails to address whether he ever received mail there. Mr. Rees maintained a golf club membership at LBCC from May 2024 to August 2025. He incurred charges there from May 2024 through June 2025, with billings addressed to the Florimond home from May through August 2024 and again March 2025 through June 2025, suggesting his regular use of that home and, at minimum, an intent to return to this usual place of abode. Once more, Mr. Rees submitted an affidavit representing, as of August 20, 2025, that he "[is] not a member of the [LBCC]," but this omitted his entire history with LBCC and neglected to disclose that this became true just four days before he signed the affidavit. In other words, again there seems to have been real effort put into trying to inoculate his connection to the Florimond home after service on February 21, 2025, and after the prejudgment order of attachment and default judgment [Dkts. 17, 18, 22].

The absence of charges on any given day no more point to Geneva than Florimond; there is just sometimes an absence of charges, and not everyone who has a golf club membership will use it every day. This doesn't mean he was absent from the Florimond home; it just means he was likely absent from the country club. Only billing statements from the winter months, when such a membership would be used less in northern Indiana, were addressed to the Geneva home. This, it is true, could fairly cut both ways, but the country club sits approximately 100 miles from the Geneva home and only 500-800 yards from the Florimond home, and it seems that this was done in part to process billings for a time on his fiancée's credit card. Of note, Mr. Rees listed the Geneva home as a primary address on the membership application and the Florimond home

28

as a secondary address, and his fiancée identified the Geneva home as the address to authorize automatic payments for the account, suggesting Mr. Rees would more likely be found elsewhere when he never testified that he lived with her and, to the contrary, attested at one point he was not living with her. He also never testified that he received mail in Geneva.

Mr. Rees provided what he called his version of the account statements from May 2024 through August 2025 (notably different because his set was all addressed to the Geneva home except for April 2025 and thereafter). On this record, if the choice presented to the court is between account statements produced directly from LBCC with a sworn custodial affidavit attesting to their accuracy versus those offered by Mr. Rees, the court chooses the independent party. Indeed, the court views this submission from Mr. Rees as nothing more than another effort to overwork the facts, thereby undermining his credibility.

Similar attempts to obfuscate his connection to a black Tesla—another farfetched story about Mr. Rees having unfettered permission from some unnamed person to use it—are likewise telling. He said in his sworn affidavit that he did not have "a personal vehicle registered in Indiana," though he purchased a Tesla, registered the vehicle in New York, surrendered the plates in New York, and, on this record, exclusively used the vehicle in Indiana in 2024 and 2025 after it was registered to the Florimond address under a company called Morf (just after the Florimond home was purchased)—all so he could continue to live under the radar. His exclusive use of this vehicle and its sole registration to the Florimond address once more tend to place him concertedly there in these same years.

The same Tesla was spotted at the Florimond home at various times in late 2024 and into 2025. On October 26, 2024, he received a warning for speeding from the Long Beach Police Department, and there is no indication that he drove any other vehicle than the black Tesla that

29

year. On November 12, 2024, a Long Beach police officer, seeking to serve Mr. Rees with a New York felony arrest warrant, observed the Tesla at the Florimond property before conducting a traffic stop and confirming Mr. Rees's identity. On February 13, 2025, an investigator observed a black vehicle consistent with a Tesla in the garage of the Florimond home. And again, on August 23, 2025, Mr. Rees was seen at the Florimond home with the black Tesla, parked partially inside the open garage. This lends field intel that in 2024 and 2025 the Tesla was not only registered to the Florimond address but used by Mr. Rees there.

Mr. Rees followed a similar *modus operandi* here as he has before. He first claimed to a New York federal court to be transient without a primary residence, doing so on December 6, 2024, only two weeks later to provide a firm address to a different judge in a different case in state court. Though there is no way to verify which address, because he apparently told the court *in camera*, Mr. Rees says he gave the state court judge the Geneva address. He tells this court something similar, but nothing else strongly or convincingly substantiates that he bounced around or that the Geneva home is his dwelling house or usual place of abode.

To the extent he suggests having a more permanent association with the Geneva residence, his Illinois driver's license is no added help as it lists a different Chicago address. From there, he offers mere fragments of activity in Illinois. The court credits, for there is no reason to doubt, that Mr. Rees had medical appointments in Illinois in February and March 2025. Indeed, his medical procedure on February 11, 2025 may explain why he never answered the door for the investigator at the Florimond home on February 13, 2025, if he was recovering. It seems he returned to the Florimond home, however; after all, the Tesla was present that day, and he incurred three dining charges at the country club on February 15, 2025 and another charge on

March 4, 2025, meaning there is little reason to believe that service on February 21, 2025 would not have been effective. And he was likely the man refusing service on February 21 too.

Mr. Rees had a procedure and medical consult on February 18, 2025, with another three visits the next month, but nothing in the record suggests these visits were lengthy, or that these procedures were anything but outpatient on a single day, or that he must have been living in Illinois because he could not drive to them from the Florimond home. He could have just as easily driven to these appointments from Indiana and returned home to Indiana afterwards, or perhaps temporarily stayed at the Geneva home (with his fiancée or her relative) the night before to make the drive to the appointment the next day shorter (noting that some began early morning), or stayed the same day after the appointment before returning to Indiana.[12] These medical records corroborate certain appointments in Illinois, but they are not strong and convincing evidence that he was usually domiciled at the Geneva home.

His medical appointments and food and drink purchases cover only 7 days out of 59 days in February and March 2025. His purchases on two of these days amount to a grand total of $170.46—not much, not for someone who claims to be living near-continuously in Geneva (within the Chicago suburbs). His receipts from February 21, 2025 lack any timestamp, so are easily attributable to later purchases, after service at the Florimond home at 7:27 a.m. that day. Mr. Rees offers no billing, credit card, or other financial statements—for February 2025 or any other month—that would help account for his spending (and thereby suggest his location) over a longer or more concerted period. He provides no billing history or payments for charging the

---

[12] His medical appointments on March 17 and March 20, 2025 perhaps explain why the USMS was not able to reach him on those dates at the Florimond home in serving the prejudgment order of attachment [Dkts. 17, 18].

Tesla he drove (which often bills the stored payment method based on the car's VIN), much less for groceries, restaurants, clothes, utilities, subscriptions, other retail purchases, tolls, or any number of things that people pay for day-to-day as they live in a location. In short, his documented activity in Illinois—even if all credited on its face—presents as notably occasional rather than regular or domiciliary.

Anything else from Mr. Rees's affidavits are largely inconsequential to the calculus. He says he has never paid Indiana income taxes and has not filed an Indiana return, but he claimed to be retired (per his LBCC application), with no reported income on this record. Nor has he said where he filed a return if he had any income. A retired individual would not likely have professional licenses or certifications either. He says his immediate family lives outside Indiana, and no children attend schools in Indiana, but his children are adults, and he does not live with them, so this likewise offers nothing of real import [Tr. 187]. He says his "primary" financial accounts and institutions exist outside Indiana; but, even putting aside the relevance of this in the digital age, this strikes as too careful couching. And once more, nothing about this statement points decidedly to Illinois. His lack of membership in various organizations, such as LBCC, has already been addressed to illustrate that this too clings to hairpin phrasing.

The court must assess whether Mr. Rees has met his burden of offering strong and convincing evidence that the Florimond home was neither his dwelling house nor his usual place of abode. With so much pointing to the Florimond home and so little to corroborate that it was actually a home in Geneva, Mr. Rees has not met his burden. "Indiana courts employ an objective test in their service of process calculus: whether due process is satisfied depends on the form of

service, not on whether the affected party was actually notified."[13] *Swaim*, 73 F.3d at 721 (citing *Riley*, 338 N.E.2d at 675). On this record, he cannot upend the presumption or the evidence of service, so the default judgment must remain.

The court might be entitled to stop there. But Ms. Doe would meet her burden too, considering today's findings based on the totality of the evidence. One's dwelling house or usual place of abode isn't determined solely based on where a person resides on the day of service. It can also be where he usually lived or planned to return. *See Grecco*, 386 N.E.2d at 533-34. Mr. Rees had unfettered access and use of the Florimond home; he had responsibility for the home and exercised that repeatedly; he had intimate knowledge about the home and its affairs and welfare (financial and otherwise); others knew to contact him specifically about the home; he controlled billing of its utilities; he identified the home's address as a place where he could be located; he maintained membership in a golf club no more than 800 yards from the home; he was recurrently at or found near the home in 2024 and 2025; his car of choice in 2024 and 2025 was registered to the home; and, on this record, he was the only one likely there in 2024 and 2025, including on February 21, 2025 when service occurred. *See, e.g., Doyle*, 658 N.E.2d at 109 (mailing address, license address, address with insurance company). The absence of other common hallmarks that might connect him to the home even more are explained by his efforts to remain unidentifiable or unlocatable—the trust, the LLC, and using the names of others for bills and services. His lack of credibility wouldn't invert the burden; but, taking that together with Ms. Doe's showing that no other reasonable alternative for a dwelling house or usual place of abode exists, the likely answer for perfecting service of process in February 2025 was the

---

[13] Even so, Mr. Rees admits that he received notice on April 21, 2025, though he never appeared to contest the case until July 9, 2025, so his sense of urgency was never really there.

Florimond home. *See Mueller*, 287 N.E.2d at 889 (method of service "is sufficient if no other method better calculated to give notice is available").

Mr. Rees argues that this would be a nonsensical result because it suggests he willingly ignored a lawsuit. Yet there seems to have been some real effort by Mr. Rees to hide, and even to evade service at times. For instance, no one else is credibly reported to have stayed or lived at the Florimond home except Mr. Rees, and the man speaking with the process server on February 21, 2025, who declined to open the door for a Jonathan Rees or Greg Ellis, gave variable answers as to why—both that Mr. Rees was not there or that he was not home, and also that he did not live there—a whole series of statements that, in their totality, are inconsistent, and more reflective of someone dodging service than being honest about the circumstances. *See* Ind. Tr. R. 4.16(A) (rules impose a duty on "every person being served under the[] rules to cooperate, accept service, comply with [the] rules"). There is no sound rationale for why someone else might give such shifting responses. This wasn't the first time either. In November 2024, Mr. Rees repeatedly refused service in another case from a police officer who was then forced to place the documents on his car door. And Mr. Rees's efforts to obscure the information about his whereabouts may now rest on his shoulders by his very own design.

In reaching this result, the court remains cognizant of the judgment's value and its partial mooring on Ms. Doe's allegations of Mr. Rees's default in the New York action, which has since been undone. The latter has not been argued as undoing the judgment here. The IUFTA permits Ms. Doe to proceed on a contingent claim, *see* Ind. Code § 32-18-2-2(2) (defining a claim as "a right to payment, whether or not the right is . . . contingent"), and her recovery is limited to "the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less," Ind. Code. § 32-18-2-18(b)(1).

CONCLUSION

The court finds that service of process occurred, consistent with due process, and that the court has personal jurisdiction such that the default judgment should not be vacated. Accordingly, the court DENIES the motion to set aside the default judgment [27].

SO ORDERED.

March 18, 2026                                    s/ Damon R. Leichty
                                                 Judge, United States District Court

35